UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL McELHENNY,                    :
                                      :CIVIL ACTION NO. 3:15-CV-103
          Plaintiff,                  :
                                      :(JUDGE CONABOY)
          v.                          :
                                      :
CAROLYN W. COLVIN,                    :
Acting Commissioner of                :
Social Security,                      :
                                      :
          Defendant.                  :

_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  (Doc. 1.)  Plaintiff originally alleged disability due to mental conditions, reporting an onset date of April 19, 2011. (*See*, *e.g.*, R. 11, 162.)  The Administrative Law Judge ("ALJ") who evaluated the claim concluded that Plaintiff's severe impairments of bipolar disorder and polysubstance abuse did not meet or equal the listings alone or in combination with Plaintiff's non-severe impairments.  (R. 14, 15.)  The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform a full range of work at all exertional levels but with certain nonexertional limitations and that he was capable of performing his past relevant work.  (R. 20-21.)  The ALJ therefore found Plaintiff was not disabled under the Act.  (R. 22.)

With this action, Plaintiff argues that the decision of the Social Security Administration must be remanded.  (Doc. 11 at 20-21.)  He identifies the following errors: 1) the ALJ erred at step three in determining that Plaintiff's bipolar disorder does not meet medical listing 12.04; 2) the ALJ did not properly evaluate Plaintiff's treating and evaluating physicians; and 3) the ALJ's credibility determination as to the severity of Plaintiff's limitations is not supported by substantial evidence.  (Doc. 11 at 2.)

After careful consideration of the administrative record and the parties' filings, we conclude Plaintiff's appeal is properly denied.

## I. Background

### A. *Procedural Background*

On December 29, 2011, Plaintiff protectively filed applications for DIB and SSI.  (R. 11.)  As noted above, Plaintiff alleges disability beginning on April 19, 2011.  (*Id.*)  In his application for benefits, Plaintiff claimed his ability to work was limited because of bipolar disorder, bipolar I disorder, and schizoid personality disorder.  (R. 162.)  The claim was initially denied on April 9, 2012.  (R. 11.)  Plaintiff filed a request for a review before an ALJ on May 7, 2012.  (*Id.*)  On July 19, 2013, Plaintiff appeared and testified at a hearing in Harrisburg before ALJ Patrick S. Cutter.  (R. 23-49.)  Plaintiff appeared with his

attorney, and a vocational expert (VE) also testified. (*Id.*) The ALJ issued his unfavorable decision on August 2, 2013, finding that Plaintiff was not disabled under the Social Security Act. (R. 22.) On August 21, 2013, Plaintiff requested a review with the Appeal's Council. (R. 6-7.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision on November 14, 2014. (R. 1-5.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

On January 16, 2015, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision. (Doc. 1.) Defendant filed her answer and the Social Security Administration transcript on March 27, 2015. (Docs. 9, 10.) Plaintiff filed his supporting brief on May 11, 2015. (Doc. 11.) Defendant filed her opposition brief on June 15, 2015 (Doc. 12), and Plaintiff filed his reply brief on June 25, 2015 (Doc. 15). Therefore, this matter is fully briefed and ripe for disposition.

## B.   *Factual Background*

Plaintiff was born on February 5, 1980, and was thirty-one years old on the alleged disability onset date of April 19, 2011. (R. 50.) Plaintiff has a high school education. (*Id.*) He reported that he stopped working on August 20, 2010, "[b]ecause of other reasons." (R. 162.) Plaintiff worked as a short order cook, landscape laborer, fast food worker, and a commercial or institutional cleaner. (Doc. 11 at 3.)

3

1.   **Impairment Evidence**

On June 20, 2011, Plaintiff saw Bret A. Daniels, M.D., at Twin Rose Family Medicine at Lancaster General Health.  (R. 259.) Dr. Daniels had last seen Plaintiff in July of 2009.  (*Id.*)  He was on parole at the time of his June 2011 visit.  Plaintiff reported he had been clean since he was jailed in April 2010, and he complained of decreased motivation.  (*Id.*)  Dr. Daniels reported that Plaintiff was alert on examination and his mood was not restricted.  (*Id.*)  He assessed Plaintiff to have substance abuse problems and bipolar disorder and recommended drug and alcohol counseling as well as psychiatric counseling.  (*Id.*)  Dr. Daniels stated that he started Plaintiff back on Lamictal, which Plaintiff had been on in the past for treatment of his bipolar disorder. (*Id.*)

Plaintiff visited Twin Rose on June 30, 2011, and July 7, 2011, for follow up after he had been seen in the emergency room at Memorial Hospital as a result of injuries sustained when he was a bystander in a bar scuffle and an insect bite he had gotten a few weeks before.  (R. 265, 272.)  Plaintiff was alert and oriented, had normal mood and affect, and his behavior was normal.  (R. 266, 273.)  He was assessed with right-sided Bell's Palsy and the Lyme disease suspected at the June 30th visit was confirmed at the July 7th visit.  (*Id.*)  Plaintiff was treated with prednisone and antibiotics.  (*Id.*)

4

On August 3, 2011, Plaintiff again saw Dr. Daniels who reported that Plaintiff said he had been clean since his June visit but he had not gotten counseling, and had not started taking medication because of the cost.  (R. 279.)  Plaintiff stated that he was feeling well emotionally and, on examination, he was alert.  (*Id.*)  Plaintiff also told Dr. Daniels he would begin taking the Lamictal and would see a psychiatrist.  (*Id.*)  Substance abuse counseling was again recommended.  (*Id.*)

On November 23, 2011, Plaintiff was seen at Lancaster General Health for a psychiatric evaluation.  (R. 223.)  The examiner, who appears to have been Leo Dorozynsky, M.D., (see R. 224-25) noted that Plaintiff reportedly had been sober since April 2010.  (*Id.*)  Plaintiff was taking Lamictal and Prilosec at the time.  (R. 224.)  In a patient questionnaire, Plaintiff indicated that he had little interest in doing things, he felt depressed or hopeless and anxious or on edge.  (R. 226.)  Plaintiff's diagnosis was bipolar disorder.  (R. 229.)

On November 28, 2011, Plaintiff presented at Lancaster General Health for Suboxone Pretreatment Screening.  (R. 233.)  Plaintiff reported that his substance of choice was heroin and he had been using five to ten bags daily for four months.  (*Id.*)  Under "substance abuse history," Plaintiff identified several substances including alcohol, cocaine, heroin, marijuana, pain killers, and ecstasy.  (R. 234.)  He stated that his longest period of

abstinence was one year.  (*Id.*)

At his suboxone induction on the same date, Eric Hussar, M.D., at Twin Rose Lancaster General Health noted in his "review of systems" that the psychiatric/behavioral category was positive for depression and that Plaintiff was nervous/anxious.  (R. 287.)  He also noted that Plaintiff was oriented to person, place, and time, he appeared well-developed and well-nourished, and he was not in distress.  (R. 288.)  He also found Plaintiff to have a normal mood and affect.  (R. 288.)  Plaintiff was instructed on the use of suboxone, including to wait until he was in moderate to severe withdrawal before starting it.  (*Id.*)

At his visit with Dr. Dorozynsky on December 5, 2011, Plaintiff stated he was doing better with Seroquel, that his mood had improved and he was sleeping well but not sedated during the day.  (R. 214.)  He noted that Plaintiff continued to deny relapse into substance abuse. (*Id.*)  Dr. Dorozynsky recorded Plaintiff's mood to be euthymic and his affect appropriate.  (*Id.*)  He also noted that Plaintiff's level of functioning was "good; improved." (*Id.*)  The goals were to maintain remission, continue medication regimen and abstain from drugs and alcohol. (R. 215.)

On January 3, 2012, Plaintiff was admitted to the Roxbury Treatment Center, with the "reason for treatment" noted as Plaintiff "reported that health was declining due to binges and sleep pattern."  (R. 239.)  He was diagnosed with opioid

6

dependence, cannabis abuse, cocaine abuse, and bipolar disorder NOS; his GAF was assessed to be 40. (*Id.*)  Treatment notes recorded Plaintiff's presenting problem as follows: "This 31-year-old single Caucasian male is admitted to the detox phase of treatment for opiate dependency.  This is his third inpatient treatment stay." (R. 243.)  As well as gaining time being clean and sober, it was anticipated that Plaintiff would be able to develop coping skills and address his mental health needs in the course of his treatment at Roxbury. (R. 243.)  Plaintiff was discharged on January 27, 2012. (*Id.*)  His condition was recorded as "oriented" and his prognosis was that he appeared motivated to follow up with aftercare and continue the recovery process. (R. 240.)

On January 31, 2012, Plaintiff was seen at T.W. Ponessa & Associates Counseling Services. (R. 301.)  His disorders were recorded to be Bipolar II Disorder, Opioid Dependence, and Alcohol Dependence, he had a GAF of 50. (R. 301.)  He was reportedly seeking outpatient counseling to address issues related to mood instability, substance dependence, and legal problems. (*Id.*)

On February 24, 2012, Plaintiff, accompanied by his mother, saw Dr. Dorozynsky at Lancaster General Health. (R. 399.)  In his "Pertinent interval history" narrative, Dr. Dorozynsky noted that Plaintiff had stopped taking his medications prior to his Roxbury hospitalization but was restarted on them. (*Id.*)  Plaintiff was

going to counseling at T.W. Ponessa.  (*Id.*)  Dr. Dorozynsky added

the following:

> States he has been clean and sober since the
> rehabilitation.  They brought in prior
> psychiatric evaluations from 1999 which we
> reviewed amongst other diagnoses was given
> diagnoses of bipolar disorder type I.
> Patient now acknowledges having had
> delusional and psychotic symptoms at that
> time accompanied by manic symptoms so it
> appears his diagnosis is actually bipolar
> disorder type I.  Most recently he has been
> feeling depressed somewhat tired when asked
> admits passive passing suicidal feelings but
> denies any intentions or plans. . . . He also
> brought in a disability form from the York
> County legal system I indicated he is
> currently disabled estimated until July of
> this year.  In the past was on Wellbutrin
> tolerated it well is not sure how helpful it
> was, however given continued depressive
> symptoms despite Seroquel and Lamictal,
> adding a low dose of Wellbutrin would br
> reasonable.

(R. 399.)  At the visit Plaintiff's mood was recorded as depressed

and his affect constricted.  (*Id.*)

At his visit with Dr. Dorozynsky on March 2, 2012, Plaintiff

reported that his mood was better but he felt somewhat tired and

sleepy, especially in the morning.  (R. 404.)  Plaintiff was not

sure if this was a result of some residual depression or side

effects of medication.  (*Id.*)  Medication alteration was discussed

and it was recorded that Plaintiff was staying in therapy and

remained sober, his mood was neutral, his affect constricted, and

his level of functioning was "[f]air; Improved, slightly."  (*Id.*)

On March 15, 2012, Plaintiff reported he was still

8

oversleeping some and felt a lack of motivation, "not clear if this is sedation." (R. 409.)  Plaintiff also reported feeling some anxiety about being in public. (*Id.*)  Dr. Dorozynsky's plan was to increase the Wellbutrin dosage, and consider switching some medications depending on Plaintiff's response. (*Id.*)  Plaintiff's mood was recorded as neutral, anxious and depressed, his affect constricted, and his level of functioning was fair and improved. (*Id.*)

On March 30, 2012, Plaintiff saw Barry Hart, Ph.D., for a clinical psychological examination. (R. 348.)  When asked about his mood, Plaintiff reported that he could be "either angry or 'not care about anything' but his medication appears to have his moods reasonably well stabilized." (R. 349.)  Dr. Hart recorded that Plaintiff worked for York Container for two years unloading containers prior to his incarceration in April 2010 and he tried to go back to York Container and other previous employers when he got out of jail but none of them would hire him, claiming he was too unreliable. (R. 349.)  Regarding his mental status, Dr. Hart noted that Plaintiff's speech was clear, coherent, and goal-directed; he again noted Plaintiff's mood was reasonably stable with medication, adding that without it, his mood could be quite labile. (R. 350.)  Plaintiff denied any perceptual disturbances or disorders of thinking. (*Id.*)  Dr. Hart noted that Plaintiff offered very little insight into his condition, stating "it's who I am" when asked what

9

he thought caused his mental health problems.  (*Id.*)  He later added that he though it was probably due to hereditary issues. (*Id.*)  Dr. Hart found that Plaintiff "appeared to present genuinely and thus his reports is [sic] considered to be an accurate representation of his current mental health."  (*Id.*)

Dr. Hart diagnosed Bipolar I disorder and polysubstance abuse in sustained partial remission, and he assessed a GAF of 60.  (*Id.*) Dr. Hart opined that Plaintiff's prognosis was reasonable in that he appeared to be on medication that was stabilizing his moods and he had been clean from drugs for two months.  (R. 351.)  Regarding the effects of his impairment on function, Dr. Hart noted that his concentration should not be an impediment to his ability to hold down a job.  (*Id.*)  The only limitations noted by Dr. Hart were in the area of Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures.  (R. 353.)  Plaintiff had slight limitations in the following areas: interacting appropriately with the public; interacting appropriately with supervisors; and interacting appropriately with co-workers.  (*Id.*) Dr. Hart noted a marked limitation in the area of responding appropriately to work pressures in a usual work setting but no limitation in responding appropriately to changes in routine work setting.  (*Id.*)  Dr. Hart stated that the clinical findings supporting the marked assessment were that Plaintiff made mistakes under pressure and got yelled at a lot at work but was only written

10

up once.  (R. 353.)

On April 23, 2012, Plaintiff reported to Dr. Dorozynsky that his mood had improved but he remained tired during the daytime from Seroquel.  (R. 414.)  Plaintiff also reported that he remained in recovery and in counseling.  (*Id.*)  Dr. Dorozynsky planned to switch medications the following month if the daytime sedation continued.  (*Id.*)  Plaintiff's mood was recorded as neutral, his affect constricted, and his level of functioning was fair and remained constant.  (*Id.*)

On May 15, 2012, Plaintiff's mother accompanied on a visit to Dr. Dorozynsky.  (R. 421.)  Plaintiff reported that he was not depressed but he remained tired and was not sure if it was from the Seroquel, adding that he had always tended to lack motivation and stay in bed when he could.  (*Id.*)  Plaintiff's mother reported that he had some days where he is more upbeat and energized and other days he seemed more tired and down.   (*Id.*)  The plan was to try Plaintiff on Abilify.  (*Id.*)  Plaintiff's mood was recorded as neutral, his affect appropriate, and his level of functioning was fair and remained constant.  (*Id.*)

At his June 28, 2012, visit with Dr. Dorozynsky, Plaintiff reported that he was "feeling good generally in that he is not tired and groggy anymore."  (R. 426.)  He described occasional "bouts of depression" and said he could be irritable, and also that he tended to forget to take his Wellbutrin and Lamictal a couple

11

days a week.  (*Id.*)  Plaintiff agreed to be more compliant with his medication regimen.  (*Id.*)  Plaintiff's mood was recorded as neutral, his affect constricted, and his level of functioning fair and improved.  (*Id.*)

Plaintiff was incarcerated at York County Prison from July 2012 through September 2012 for violating probation.  (R. 360-84, 431.)  On the Receiving Screening/Health Assessment dated July 26, 2012, Plaintiff admitted to using three bags of heroin the day before.  (R. 361.)  Plaintiff was reported to be alert and oriented.  (R. 365.)  In a Mental Health Screen on the same date, Plaintiff identified with people whose moods change frequently and daily find themselves on an emotional roller coaster.  (R. 366.) He also reported that he could get irritable and start fights. (*Id.*)  On August 12, 2012, Plaintiff's Mental Status Exam indcated that he was oriented to person, place and time, he was cooperative, his mood was normal, his affect was broad, his thought process was logical and organized, his though content was normal, and his judgment, insight and memory were intact.  (R. 381.)  It was also noted that Plaintiff's medications--Abilify, Wellbutrin, and Lamictal--were effective.  (R. 382.)

From September through December of 2012, Plaintiff underwent drug rehabilitation at Colonial House.  (R. 385-391.)  It was noted on his December 3, 2012, Discharge Summary that Plaintiff completed his eighty-four day treatment with no drug use.  (R. 385.)

Plaintiff's "Response to Treatment" included the notations that he was "externally motivated thru legals," and he had been meeting all treatment plan goals and participating in groups and lectures.  (R. 385.)  In group counseling, Plaintiff dealt with problems on feeling and intellectual levels and was able to handle confrontation and criticism.  (*Id.*)  Further notations indicate Plaintiff's emotions were appropriate, his affect was generally appropriate, and he socialized effectively and appropriately.  (R. 387.)  Plaintiff's prognosis was reported to be fair, a determination which was  explained with the comment that he was in early recovery and needed to reach out to build his support.  (*Id.*)

On January 22, 2013, Plaintiff was seen by Dr. Bowen at Lancaster General Health.  (R. 431.)  Plaintiff reported that he was feeling "pretty decent" and his current medication regimen was effective.  (*Id.*)  After being released from jail to the rehabilitation program, Plaintiff was living in a halfway house at the time of his visit.  (*Id.*)  Plaintiff denied depressive or manic episodes and denied sleep problems.  (*Id.*)  Plaintiff reported that he was working full-time at the Franklin and Marshall College kitchen.  (*Id.*)  Dr. Bowen recorded Plaintiff's appearance to be calm, cooperative, and well kempt, his mood was euthymic, his affect was in the slightly constricted range but euthymic and appropriate, and his attention and concentration were within normal limits.  (*Id.*)  Dr. Bowen's assessment of Plaintiff's condition was

"Fair; Remained Constant since his incarceration."  (R. 432.)

Plaintiff again saw Dr. Bowen on February 9, 2013.  (R. 437.)

Plaintiff reported that he had trouble sleeping during the two

weeks preceding his visit (sleeping four to five hours a night) and

he felt tired during the day.  (*Id.*)  Dr. Bowen recorded

Plaintiff's appearance to be well kempt and his behavior

cooperative, his thought processes were linear and logical, thought

association was intact and coherent, Plaintiff's mood was described

as primarily euthymic, his affect was appropriate and euthymic,

full range, and his attention and concentration were within normal

limits.  (*Id.*)  Dr. Bowen noted that Plaintiff was engaged in

substance abuse treatment.  (*Id.*)  Plaintiff's medications were

adjusted and Ambien was added to address Plaintiff's reported sleep

problem.  (*Id.*)  Dr. Bowen's assessment of Plaintiff's condition

was "Fair; Remained Constant."  (R. 438.)

At his April 3, 2013, visit with Dr. Bowen, Plaintiff reported

that overall he was doing well.  (R. 443.)  He stated that he

planned to change jobs and had given his two-week notice as his job

was too stressful.  (*Id.*)  He planned to work in construction.

(*Id.*)  He asked Dr. Bowen to write a letter detailing his diagnosis

and that he was prescribed medication, stating he wanted to use the

letter in claims for disability or child support.  (*Id.*)  Dr. Bowen

recorded Plaintiff to be well kempt, calm and cooperative.  (*Id.*)

He also noted that Plaintiff's thought processes were linear and

14

logical, his thought association was intact and coherent, his mood was euthymic a majority of the time, his affect was appropriate and euthymic, full range, and his attention and concentration were within normal limits. (*Id.*)  Dr. Bowen's assessment of Plaintiff's condition was "Good; Improved."  (R. 444.)

## 2.   **Opinion Evidence**

In addition to the opinion rendered in conjunction with Dr. Hart's consultative examination set out above, Melissa Diorio, Psy.D., the State Agency reviewer, rendered an assessment in April 2012. (*See* R. 50-59.)  Also Dr. Dorozynsky offered an opinion in a form report from York County Domestic Relations (R. 416), and Dr. Bowen wrote a letter requested by Plaintiff for disability and child support purposes (R. 395-443).

Dr. Diorio found that Plaintiff had the severe impairment of Affective Disorders and that his mood was reasonably well stabilized with medications.  (R. 53.)  Dr. Diorio considered the affective disorders under the "A" criteria of the Listings: under 12.04 - Affective Disorders, she determined that Plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria; under 12.09 - Substance Addiction Disorders, she determined that Plaintiff had a medically determinalbe impairment that did not precisely satisfy the diagnostic criteria.  (R. 54.)  Under the "B" criteria of the Listings, Dr. Diorio found the following: Plaintiff had mild

restriction of activities of daily living; he had mild difficulties in maintaining social functioning; he had moderate difficulties in maintaining concentration, persistence, or pace; and he and no repeated episodes of decompensation, each of extended duration. (*Id.*)  Dr. Diorio found that the evidence did not establish the presence of the "C" criteria of the Listings.  (*Id.*)

Based on the evidence of record, Plaintiff was found to be partially credible.  (*Id.*)  In making this determination, Dr. Diorio considered Plaintiff's activities of daily living, his medication, the treatment he had received and "other measures to relieve symptoms."  (R. 55.)

In her Mental Residual Functional Capacity Assessment, Dr. Diorio concluded that Plaintiff did not have understanding and memory limitations.  (R. 55.)  She found that he had sustained concentration and persistence limitations as follows: he was moderately limited in his ability to maintain attention and concentration for extended periods; and he was moderately limited in his "ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (R. 56.)  In narrative form, Dr. Diorio explained that

> [t]he claimant is capable of working within a
> work schedule and at a consistent pace.
> Claimant can make simple decisions.  The
> claimant is able to carry out very short and
> simple instructions.  The claimant is able to
> maintain concentration and attention for

16

> extended periods of time.  The claimant would
> be able to maintain regular attendance and be
> punctual.  The claimant would be expected to
> complete a normal week without exacerbation
> of psychological symptoms.
>
> The claimant is able to meet the basic
> mental demands of competitive work on a
> sustained basis despite the limitations
> resulting from his impairment.

(R. 56.)

Dr. Diorio reviewed Dr. Hart's opinion, noting that her RFC assessment partially reflects his opinion.  (R. 56.)  She noted that Dr. Hart's statements concerning Plaintiff's abilities in the area of making personal and social adjustments are well supported by the medical and non-medical evidence in the file but his statements about making occupational and performance adjustments were not consistent with all the medical and non-medical evidence. (*Id.*)

In a "Disability Information for Court" form from York County Domestic Relations Section completed on April 23, 2012, Dr. Dorozynsky noted that Plaintiff was fully disabled with limitations identified as tired and lack of motivation.  (R. 416.)  He also noted that Plaintiff would be able to return to work in July 2012. (*Id.*)

Finally, on April 3, 2013, Dr. Bowen authored correspondence "To Whom It May Concern" stating that Plaintiff was seen on that date in his office and that he was treated regularly for bipolar disorder.  (R. 395.)  Dr. Bowen added that Plaintiff was prescribed

17

medications that were deemed necessary to control his symptoms and maintain functioning.  (*Id.*)  Plaintiff asked Dr. Bowen to write the letter for Plaintiff's use regarding disability and child support.  (R. 394, 443.)  The only other information provided in the letter was that Plaintiff had been seen on that date, he was treated for bipolar disorder and had regular appointments in the clinic.  (R. 396.)

3.   **Hearing Testimony**

Plaintiff was thirty-three years old at the time of the hearing.  (R. 26.)  Plaintiff reported he had not used heroin, marijuana, or alcohol since July 26, 2012, he was attending AA meetings, and he was paying the fines associated with his prior incarceration (DUI) and probation.  (R. 28-29, 36.)  For the period from April 19, 2011, to July 26, 2012, Plaintiff said the only drug he used was heroin which he had started to use heroin about a year before then when he got out of jail.  (R. 36.)

Plaintiff stated that his probation conditions did not require that he look for work or be employed, but he was looking for work anyway.  (R. 28.)  He said that during 2013 he had worked as a cook in the kitchen at Franklin and Marshall College--he was not sure of the dates or duration of his employment there.  (R. 30.)  Plaintiff added it was very fast-paced work that he could not keep up with. (R. 31.)  He left the job because of the stress, he was getting yelled at by the sous chef on a regular basis and that was scaring

him because the sous chef would slap him and punch him in the arm. (R. 39.)  In June 2013 he worked briefly for M & J Professions as a contractor's assistant.  (R. 31-32.)  The same month he began working as a ceiling cleaner for a cleaning business where his girlfriend was the supervisor.  (R. 32.)  His work schedule varied depending on the amount of work the company had--he estimated that his pay was about $800 to $900 per month.  (R. 33.)

Plaintiff testified that he cannot maintain employment at the substantial gainful activity level because racing thoughts and fantasizing about how things should be made him slower than he should be and mades him sometimes "screw up."  (R. 34.)  He said this is true of his cleaning job and he would not have the job if his girlfriend were not the supervisor.  (R. 38.)

The ALJ reviewed Plaintiff's prescribed medications.  (R. 34.) Plaintiff verified that he was taking them and that his doctor had just increased the dosage of Lamictal to address anxiety when around other people.  (*Id.*)  He added that the increased dosage seemed to be working.  (*Id.*)  Regarding medication side-effects, the most notable was Plaintiff's testimony that the Wellbutrin could make him "really jittery" sometimes.  (R. 35.)  He also said that he experienced a little light-headedness and sleepiness with Risperdal.  (*Id.*)

Plaintiff reported that he was going to be going for counseling to "TW Pinesta" but he had only done the intake.  (R.

19

35.)

For hobbies, Plaintiff looks at his baseball card collection (he had stopped collecting about three years before) and writes poetry but recently had experienced a mental block.  (R. 37, 40.)  Plaintiff visits his parents and younger daughter weekly.  (R. 37-38.)  His daily routine depends on whether he has been working--if he worked the night before, he would sleep most of the day, then eat something, watch TV, and go back to work.  (R. 37.)

When asked about his sleep patterns by his attorney, Plaintiff testified that he hadn't gotten much sleep over the preceding week and that happens about once a month.  (R. 40.)  He did not know what triggered the sleep problem but said it usually happened after work and he would come home with a lot of energy and couldn't "seem to calm down and relax."  (R. 40-41.)

Plaintiff's attorney also asked if Plaintiff had ever tried to hurt himself and Plaintiff responded that he had burned himself with a cigarette the month before.  (R. 42.)  Plaintiff testified that he had done this because he "just wanted to feel something"--he did not need or seek treatment for the burn.  (R. 42-43.)

A vocational expert also testified.  (R. 45-49.)  ALJ Cutter asked the VE to assume a hypothetical person with the same vocational profile as Plaintiff and RFC to perform a range of work at any exertional level subject to the following limitations:

> the individual has moderate restriction and moderate is defined as more than a slight

20

> limitation but the function can still be
> performed on a consistent enough basis to be
> satisfactory to an employer and the ability
> to maintain attention or concentration.
> Respond appropriately to work pressures in
> the usual setting; interact appropriately
> with the public, supervisors or co-workers
> and complete a normal work day or work week
> without an unreasonable number or length of
> rest periods due to psychologically based
> symptoms.

(R. 46.)  The VE was asked whether such a person would be able to perform any of the past relevant work previously described.  (*Id.*) The VE responded that each of the occupations described (short order cook, landscape laborer, laborer of stores, fast food worker, polisher buffer II, and cleaner, commercial or institutional (R. 45)) could be performed.  (R. 46.)  The VE also identified other jobs which such an individual could perform.  (R. 47.)

The ALJ's next hypothetical added a marked limitation (defined as "seriously limited, not precluded, but the function cannot be performed on a consistent enough basis to be satisfactory to an employer" (R. 48)) in the ability to respond appropriately to work pressures in the ususal work setting.  (R. 48.)  The VE responded that the hypothetical individual would not be able to perform any of Plaintiff's past relevant work or other jobs given as examples. (*Id.*)  The VE added "[t]hat person would be unemployable." (*Id.*)

4.  **ALJ Decision**

By decision of December 17, 2012, ALJ Cutter determined that Plaintiff was not disabled as defined in the Social Security Act.

(R. 50.)  He made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.    The claimant has not engaged in substantial gainful activity since April 19, 2011, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments: Bipolar Disorder and Polysubstance Abuse (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant has a moderate restriction (moderate is defined as more than a slight limitation, but the function can still be performed on a consistent enough basis to be satisfactory to an employer) in his ability to maintain attention and concentration, respond appropriately to work pressures in a usual work setting, interact appropriately with co-workers, the public, and supervisors, and complete a normal workday or workweek without an unreasonable number or length of rest periods required due to psychologically based symptoms.

> 6. The claimant is capable of performing all of his past relevant work as described below.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from April 19, 2011, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(R. 13-22.)  The ALJ reviewed the impairments noted in the record and explained how he determined that Plaintiff had the severe impairments noted above.  (R. 14.)   The ALJ also reviewed the impairments which he considered non-severe--Lyme's disease and acid reflux--explaining the designation assigned and why they did not affect Plaintiff's ability to perform basic work activities.  (R. 14.)  He determined that Plaintiff's impairments did not meet or equal the criteria listings of 12.04 and 12.09 after considering evidence of record regarding Plaintiff's limitations in the context the "paragraph B" and "paragraph C" requirements.  (R. 14-15.)

In explaining Plaintiff's RFC, the ALJ reviewed the objective and opinion evidence and set out his rationale for the weight given to Plaintiff's subjective complaints and opinions contained in the record.  (R. 17-20.)  He noted that he gave significant weight to the opinion of Dr. Diorio, the State agency psychological consultant, because she had the opportunity to review Plaintiff's available treatment records prior to rendering her opinion which

the ALJ found "consistent with the claimant's overall improvement with proper medication management and therapy."  (R. 19.)

The ALJ gave limited weight to Dr. Hart's opinion wherein Dr. Hart opined that Plaintiff had a marked difficulty in his ability to respond to work pressures in a usual work setting.  (R. 19.) The rationale for the weight attributed was that Dr. Hart's finding was based on Plaintiff's own less than credible subjective complaints and also that the marked limitation was inconsistent with Dr. Hart's own objective clinical findings, including a GAF assessment of 60.  (*Id.*)

The ALJ afforded no weight to the opinion expressed in the form completed by Dr. Dorozynsky on April 23, 2012, for York County Domestic Relations wherein Dr. Dorozynsky opined that Plaintiff was "fully disabled" and unable to return to work until July 2012.  (R. 19.)  The ALJ's rationale was that the disability determination is reserved for the Commissioner, Dr. Dorozynsky provided no support for the assessment, and his assessment is not supported by evidence of record.  (*Id.*)

The ALJ stated that the assignment of limited credibility to Plaintiff's allegations regarding the effects of his mental health conditions was based on treatment notes which indicate that his mood was effectively stabilized with medication, his April 2013 visit with Dr. Bowen where Plaintiff indicated he was doing well, and Dr. Bowen's objective assessment.  (R. 19-20.)   The ALJ also

24

based his credibility determination on Plaintiff's own inconsistent statements.  (R. 20.)

With the aid of a VE, the ALJ concluded Plaintiff could perform his past relevant work as actually and generally performed as well as other jobs which exist in the national economy.  (R 20.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fourth step of the process when the ALJ found that Plaintiff was capable of performing all of his past relevant work.  (R. 20-21.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to

support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits,

"to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*,

28

181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). It is the ALJ's responsibility to explicitly provide reasons for his decision and analysis later provided by the defendant cannot make up for analysis lacking in the ALJ's decision. *Fargnoli v. Massanari*, 247 F.3d 34, 42, 44 n.7 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07. Neither the reviewing court nor the defendant "may create or

adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Hague v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.")

### IV. Discussion

#### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases

30

demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."   *Id.*

## B.   *Plaintiff's Alleged Errors*

As set out above, Plaintiff asserts the decision of the Social Security Administration is error for the following reasons: 1) the ALJ erred at step three in determining that Plaintiff's bipolar disorder does not meet medical listing 12.04; 2) the ALJ did not properly evaluate Plaintiff's treating and evaluating physicians; and 3) the ALJ's credibility determination as to the severity of Plaintiff's limitations is not supported by substantial evidence. (Doc. 11 at 2.)

## 1.   Listing 12.04

Plaintiff first asserts that the ALJ erred when he did not find that Plaintiff's bipolar disorder met the requirements of listing 12.04.  (Doc. 11 at 10.)  Defendant argues that the ALJ appropriately found that Plaintiff's condition failed to meet the requirements of Listing 12.04B and C.  (Doc. 13 at 17.)  We agree with Defendant.

A claimant bears the burden of establishing that his impairment meets or equals a listed impairment.  *Poulos v. Comm'r of Social Security*, 474 F.3d 88, 92 (3d Cir. 2007).  In general the required level of severity for an affective disorder may be

established when the criteria for both parts A and B are met or when the criteria in paragraph C are satisfied.  20 C.F.R. pt. 404, subpt. P, App. 1 § 12.04.  The part A criteria "are medical findings that substantiate the presence of the mental disorder." *Cunningham v. Comm'r of Social Security*, 507 F. App'x 111, 116 n.4 (3d Cir. 2012) (citing 20 C.F.R. pt. 404, subpt. P, App. 1, § 1200(A)).  To satisfy the "B" criteria of Listing 12.04, the mental impairments must satisfy at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; 4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. pt. 404, subpt. P, App. 1 § 12.04(B).  "A 'marked' restriction or difficulty is one that is more than moderate but less than extreme and that 'interfere[s] seriously with [the] ability to function independently, appropriately, effectively, and on a sustained basis.'"  *Cunningham*, 507 F. App'x at 116 (citing 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00(C)).  Paragraph C of listing 12.04 requires demonstration of one of the following: 1) repeated and extended episodes of decompensation; 2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3) current history of one or more years' inability to function outside a

highly supportive living arrangement, with an indication of a
continued need for such an arrangement.  20 C.F.R. pt. 404, subpt.
P, App. 1 § 12.04(C).

The ALJ considered both the B and C criteria.  (R. 14-15.)
Under paragraph B, he reviewed all requirements and found that
Plaintiff did not meet any of them.  (*Id.*)  He found that Plaintiff
had mild restrictions in his activities of daily living--though he
complained of tiredness and a lack of motivation, he was employed.
(R. 14.)  In social functioning, the ALJ found that Plaintiff had
mild difficulties--though he complained of anxiety and difficulty
interacting with others, he testified that his medication helped
reduce his social anxiety and he was able to maintain relationships
with his girlfriend, parents and daughter.  (R. 15.)  The ALJ
concluded Plaintiff had moderate difficulties in concentration,
persistence, or pace--though he alleged difficulties regarding
focus and concentration due to racing thoughts and difficulty
keeping up with the pace of his work environment, he was able to
perform serial 7's accurately and his treating psychiatrist,
Michael Bowen, M.D., found Plaintiff's attention and concentration
within normal limits in April 2013.  (*Id.*)  The ALJ determined that
Plaintiff had experienced no episodes of decompensation.  (*Id.*)

ALJ Cutter also concluded that Plaintiff had failed to
establish the presence of the paragraph C criteria.  (*Id.*)  He
noted that he found no support in the record for the existence of

any of the criteria.  (*Id.*)

Plaintiff has failed to meet his burden on this issue in that he catalogs evidence of record but does not show how the evidence satisfies the specific listing requirements.  (Doc. 11 at 10-14.) Conclusory assertions are not enough. Furthermore, certain evidence cited misstates the record.  For example, Plaintiff states that he was seen at Lancaster General on February 24, 2012, with complaints of delusional and psychotic symptoms accompanied by manic symptoms. (Doc. 11 at 11 (citing R. 399).)  However, as set out above, at the cited visit Dr. Dorozynsky noted *by way of history* that Plaintiff and his mother brought in psychiatric evaluations *from 1999* and Plaintiff acknowledged "having had delusional and psychotic symptoms *at that time* accompanied by manic symptoms."  (R. 399 (emphasis added).)  As 1999 is long before the relevant time period, any symptoms related to Plaintiff's bipolar disorder exhibited then have no relevance to the current disability analysis.

Plaintiff argues in his reply brief that he meets the requirements of paragraph B because he has a marked impairment in social functioning and a marked impairment in maintaining concentration, persistence or pace.  (Doc. 15 at 1-3.)  Regarding social functioning, Plaintiff cites an instance during a psychiatric evaluation in which he reported that he felt anxious, another instance where he reported at an office visit that he felt

34

anxious in public, and his testimony about experiencing anxiety and constant mood swings. (Doc. 15 at 2 (citing R. 35, 226, 409).) We conclude this occasional subjective reporting does not undermine the ALJ's determination that Plaintiff had mild difficulties in maintaining social functioning.

Regarding concentration, persistence, or pace, Plaintiff again points to sporadic subjective reporting. (Doc. 15 at 2.) He also cites Dr. Hart's conclusion that Plaintiff had a marked restriction in his ability to respond appropriately to work pressures in a usual work setting. (*Id.*) The inquiry about concentration, persistence, or pace under paragraph B is distinct from a form question about an individual's ability to respond to work pressures. This is exemplified by Dr. Hart's marked limitation finding as to work pressures (R. 353) and his specific comment that Plaintiff's "concentration should not be an impediment in his ability to hold down a job" (R. 351). Thus, we conclude that Plaintiff has not provided evidence which would undermine the ALJ's conclusion that Plaintiff's mental impairment does not meet the requirements of listing 12.04.

2. **Evaluation of Opinion Evidence**

Plaintiff next argues that the ALJ erred in his evaluation of opinion evidence in that he did not give appropriate weight to the opinions of Dr. Dorozynsky, Dr. Hart, and Dr. Diorio. (Doc. 11 at 14-18.) We conclude the ALJ did not err in his consideration of

opinion evidence.

*a.   Dr. Dorozynsky*

Plaintiff identifies Dr. Dorozynsky as his treating physician, asserting that an opinion from a treating physician is entitled to great or controlling weight.  (Doc. 11 at 14.)  We agree that a treating physician's opinion is entitled to great or controlling weight in some situations, but conclude this is not such a case.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  The "treating physician rule," is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[2]  "A

---

[2] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

cardinal principle guiding disability eligibility determinations is
that the ALJ accord treating physicians' reports great weight,
especially when their opinions reflect expert judgment based on
continuing observation of the patient's condition over a prolonged
period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.
2000) (citations omitted); see also *Brownawell v. Commissioner of
Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to
reject the treating physician's assessment, an ALJ may not make
"speculative inferences from medical reports and may reject a

---

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it
> controlling weight. When we do not give the
> treating source's opinion controlling weight,
> we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as
> well as the factors in paragraphs (c)(3)
> through (c)(6) of this section in determining
> the weight to give the opinion. We will always
> give good reasons in our notice of
> determination or decision for the weight we
> give your treating source's opinion.

treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46. *Horst* noted that neither the ALJ nor the court needed to rely on the treating physician's opinion that the plaintiff was completely disabled: "As an initial matter, 'the ALJ--not treating or examining physicians or State agency consultants--must make the ultimate disability and RFC determinations." 551 F. App'x at 46 n.7 (quoting *Chandler v.*

38

*Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20 C.F.R. § 404.1527(d)). Although it is true that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence, *Morales v. Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon more than personal observations and credibility determinations in discounting the treating physician's finding of disability," the ALJ does not run afoul of relevant law. *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)). *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

As set out above, Dr. Drozynsky completed a "Disability Information for Court" form from York County Domestic Relations Section on April 23, 2012. (R. 416.) He opined that Plaintiff was fully disabled with limitations identified as tired and lack of motivation, and that Plaintiff would be able to return to work in

39

July 2012.  (*Id.*)  The ALJ gave no weight to Dr. Dorozynsky's opinion because he provided no support for his assessment, the assessment was not supported by the evidence of record, and his determination that Plaintiff was "fully disabled" is a determination reserved for the Commissioner.  (R. 19.)

In his supporting brief, Plaintiff does not point to evidence contradicting the ALJ's conclusion, nor does he cite to evidence of record supporting Dr. Dorozynsky's assessment.[3]  (Doc. 11 at 14.) Plaintiff does not refute the ALJ's assertion that Dr. Dorozynsky did not provide support for his assessment.

Importantly, even if Dr. Dorozynsky's opinion had been accorded some weight, it would not support a conclusion that Plaintiff was disabled within the meaning of the Act--the inability to engage in substantial gainful activity must have lasted or be expected to last for a continuous period of not less than twelve months, 42 U.S.C. § 423(d)(1)(A), and Dr. Dorozynsky's April 23, 2012, opinion that Plaintiff would be able to return to work in July 2012 (R. 416) does not suggest disability for the requisite time period.  Furthermore, we find that the ALJ's assessment of Dr. Dorozynsky's opinion is supported by the record.  Therefore, under the law of the Third Circuit, we find no error in the ALJ's

---

[3]  In the portion of his brief discussing the claimed error regarding Dr. Dorozynsky, Plaintiff asserts that "the ALJ erred by according no weight to Dr. Hartman's opinion."  (Doc. 11 at 15.) As there is no evidence from "Dr. Hartman" in the medical record, we assume this is a drafting error.

decision to accord no weight to Dr. Dorozynsky's opinion expressed in the form report that Plaintiff was fully disabled.

*b.   Dr. Hart*

Plaintiff next asserts that the ALJ did not accord appropriate weight to the opinion of Dr. Hart, a consultative examiner.  (Doc. 11 at 15.)  We disagree.

The ALJ explained the reasons for the weight attributed--Dr. Hart's finding was based on Plaintiff's own less than credible subjective complaints, and the marked limitation was inconsistent with Dr. Hart's own objective clinical findings, including a GAF assessment of 60.  (R. 19.) (*Id.*)

Plaintiff's argument that the use of GAF scores are now of questionable relevance and the ALJ erred by citing it (Doc. 11 at 16) does not support the claimed error.  As noted by Defendant, although the GAF scale was eliminated from the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), "this does not preclude an ALJ from determining whether a GAF score is inconsistent with other evidence."  (Doc. 13 at 26 n.7 (citing *Forster v. Colvin*, Civ. A. No. 3:13-CV-2699, 2015 WL 1608741, at *9 n.2 (M.D. Pa. Apr. 10, 2015)).)

Plaintiff also criticizes the ALJ's treatment of Dr. Hart's opinion on the basis that it is inconsistent with the ALJ's determination that Plaintiff had an unsuccessful work attempt because he was unable to keep up with the fast-paced environment.

(Doc. 11 at 17 (citing R. 13, 19).)  Specifically Plaintiff compares the ALJ's step one gainful activity notation regarding an unsuccessful work attempt with Dr. Hart's notation that Plaintiff made mistakes under pressure and was yelled at while at work, Plaintiff stating the ALJ did not find the notation persuasive. (*Id.*)

This argument is not persuasive.  First, the step one gainful employment inquiry is distinct from the RFC assessment.  Second, the ALJ did not find at step one that Plaintiff left his job because he was unable to keep up with the fast-pace:  he recorded only that Plaintiff *alleged* that was the reason he left his job. (R. 13.)  Third, there is no inconsistency in that the ALJ rejects Dr. Hart's marked limitation finding in part because it is based on Plaintiff's subjective reporting (R. 19) and there is no evidence suggesting that Plaintiff's reporting is objectively verified.

c.  *Dr. Diorio*

Plaintiff maintains the ALJ improperly assigned "significant weight" to Dr. Diorio's opinion because, as a State Agency psychological consultant, she was a non-examining, non-treating source.  (Doc. 11 at 17.)  We disagree.

Plaintiff argues that the ALJ erred because SSR 96-6p provides that a State Agency opinion can be given greater consideration than a treating source opinion only under special circumstances which are not present here.  (Doc. 11 at 17-18.)  We need not parse the

guidance on this issue set out in SSR 96-6p, 1996 WL 374180 (S.S.A.), because we have determined that the ALJ properly afforded no weight to Dr. Dorozynsky's brief form opinion and Plaintiff cites no other treating source opinion of record.   Therefore, no valid treating source opinion was given less weight than that of the State Agency consultant.[4]

## 3.   **Plaintiff's Credibility**

Plaintiff's final claimed error is that the reasons given by the ALJ for finding Plaintiff not credible as to the severity of his limitations are not supported by substantial evidence.   (Doc. 11 at 18.)   We disagree.

Plaintiff seems to assert that the ALJ dismissed Plaintiff's credibility without performing the evaluation required by SSR 96-7p.   (Doc. 11 at 18.)   He does not develop this argument but proceeds to cite four specific errors.   (*Id.* at 18-20.)   We will address each of these.

First, Plaintiff cites the ALJ's determination that

---

[4]   Though not cited by the ALJ as opinion evidence, we also find it significant that Dr. Bowen, Plaintiff's last treating source of record, when asked by Plaintiff to provide a letter for the purpose of disability or child support on April 3, 2013, did not assess any functional limitations but stated that Plaintiff was prescribed medications that were deemed necessary to control his symptoms and maintain functioning.   (R. 394, 443.)   The only other information provided in the letter was that Plaintiff had been seen that date, he was treated for bipolar disorder and had regular appointments in the clinic. (R. 396.)

Plaintiff's mood is effectively stabilized with proper medications, asserting the finding does not "automatically indicate that McElhenny lacks mental health symptoms or limitations" and the ALJ cites no legal authority in support of his assertion.  (Doc. 11 at 18-19 (citing R. 19).)  This argument does not point to error in that the ALJ did not find that Plaintiff lacked mental health symptoms or limitations--effective stabilization does not equate with absence, and, as discussed in conjunction with Plaintiff's claimed error regarding listing 12.04, the ALJ in fact attributed some limitations to Plaintiff's mental impairment.  (*See*, *e.g.*, R. 14-15.)

Second, Plaintiff argues the ALJ improperly assessed Plaintiff's testimony about his hobbies.  (Doc. 11 at 19.) Assuming that the ALJ's interpretation of Plaintiff's testimony about his hobbies is less than completely accurate, it is only one example of inconsistency cited by the ALJ and would not undermine the ALJ's general assertion.  (*See* R. 20.)  The ALJ also cites the additional symptoms alleged in response to a question asked by Plaintiff's attorney at the ALJ hearing as well as Plaintiff's inconsistent reporting regarding his use of heroin.  (*Id.*) Plaintiff does not criticize these bases for the ALJ's inconsistency finding.  Therefore, Plaintiff's claimed inaccuracy is not adequate to find the ALJ's credibility determination error.

Third, Plaintiff finds error in the ALJ's consideration of the

side effects of Plaintiff's medications.  (Doc. 11 at 19)
Plaintiff's citation to Plaintiff's testimony about the side
effects of his medication is less than completely accurate.
Plaintiff did testify that Risperdal causes light-headedness and
sleepiness and Wellbutrin makes him jittery.  (*Id.* (citing R. 35).)
However, Plaintiff qualified the effects of both: he experiences "a
little" light-headedness and sleepiness with Risperdal; "sometimes"
the Wellbutrin makes him jittery.  (R. 35.)  Plaintiff does not
further develop his argument in support of this claimed error.  As
presented, we find it without merit.

Fourth, Plaintiff asserts that the definition of a "moderate"
restriction used by the ALJ is not consistent with the SSA
definition.  (Doc. 11 at 19-20 (citing POMS DI 24510.063(B)(2)).)
Any difference in the definition provided by the ALJ to the VE and
the definition cited by Plaintiff would not be cause for remand in
that the ALJ directly instructed the VE on the meaning of
"moderate" regarding the "moderate restriction" included in the
hypothetical the ALJ posed to the VE.  (R. 46.)

### V. Conclusion

For the reasons discussed above, we find no basis for remand
in the errors claimed by Plaintiff.  Therefore, Plaintiff's appeal
of the Acting Commissioner's denial of benefits (Doc. 1) is denied.
An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: July 2, 2015